[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case presents a tale of family money and family discord. The action came to court via the plaintiff's complaint for an interpleader wherein each of the named defendants would be required to litigate their competing interests in and to certain shares of Bristol Myers Squibb common stock. In response to the plaintiff's complaint, David and Norman Bender filed a counterclaim that subsequently was amended and ultimately the trial proceeded on the amended counterclaim and the plaintiff's answer and special defenses thereto.
No pleadings were filed on behalf of Alice Bender, the wife of Jack Bender and the mother of David and Norman. She was effectively eliminated from the case when the plaintiff withdrew its interpleader complaint. Jack Bender, who is now deceased, is not involved in the present dispute. He, as will be more fully explained, had his claim transferred to an arbitration hearing wherein he was successful. The plaintiff's motion to confirm the arbitration award was denied by the court as to David and Norman Bender on July 2, 1998.
The amended counterclaim of David and Norman Bender alleges that they and their father Jack were joint tenants in account #042-556670-35 maintained at the plaintiff's New Haven office in which account, as of August 12, 1994, there were 1,000 shares of CT Page 1803 Bristol Myers Squibb stock. According to the amended counterclaim, the plaintiff, on August 29, 1994, at the request of Jack Bender and without the consent of David and Norman sold 100 shares of the stock and transferred the remaining 900 shares out of the joint account and into Jack Bender's individual account. Essentially David and Norman contend that the plaintiff's actions were conversions of their property. They seek to have 1,000 shares of Bristol Myers Squibb stock or the equivalent together with any dividends that may have occurred since August 29, 1994 redeposited in the joint account.
In its reply, the plaintiff has denied that the joint account was ever opened and averred that its actions in selling and transferring the stock were done at the behest of Jack Bender. The remainder of the reply consists of ten special defenses wherein the plaintiff claims that the losses, if any, of David and Norman resulted from their negligence or fraud or unclean hands or they cannot recover by reason of the doctrines of waiver and estoppel or res judicata or collateral estoppel or laches or that Jack Bender had full authority to direct the account activity or that David and Norman breached their mandatory arbitration agreement or that no gift occurred when the joint account was established because Jack Bender lacked donative intent and never completed a transfer. The final special defense attacks the court's subject matter jurisdiction upon an allegation that David and Norman had a mandatory contractual obligation to submit their dispute to arbitration.
 I
From the evidence presented at the hearing, the court finds that the pertinent facts set forth below were established.
James Lapides has been employed by the plaintiff since 1974. He served as manager of the plaintiff's New Haven office for twenty years with the title first vice president. He retired from management in September of 1994 but his employment has continued until the present time. One of his clients was Jack Bender. James Lapides described himself as a financial advisor to Jack Bender and to the defendants as well. Over the years, Jack Bender had opened several accounts with Lapides which, in total, were worth several millions of dollars. The defendants also maintained accounts at the plaintiff's New Haven office.
On or before August 10, 1994, Jack Bender spoke with James CT Page 1804 Lapides about opening an account for himself and the defendants. The Letter of Authorization used by the plaintiff to transfer securities or monies between accounts was signed by Jack Bender on August 10, 1994 and as a result thereof, 1,000 shares of Bristol Myers Squibb common stock was transferred from Jack Bender's individual account (#042-416910-35) into a new account (#042-556670-35) in the names of Jack Bender, Norman Bender [and] David Bender. Both accounts were in the plaintiff's "street name" so, according to James Lapides, a transfer on the books of Bristol Myers Squibb was unnecessary and the transfer from the individual account to the new joint account occurred on August 12, 1994.
When account #042-556670-35 was opened, James Lapides filled out a "New Client Record" from information he received from Jack Bender. Under section 1 entitled "Client Information" he wrote in the area provided for Legal Name/Title and Address: Mr. Jack Bender. Mr. David Bender and Mr. Norman Bender JTWROS, 120 Stimson Road, New Haven, CT 06511. For the home telephone Lapides wrote (203) 562-7625 and in the space assigned for social security number, he wrote 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. JTWROS, as explained by Lapides meant joint tenants with the right of survivorship. As Lapides further explained the Stimson Road address, the telephone number and the social security number all pertained to Jack Bender. When account #042-556670-35 was opened the defendants resided at their respective homes in the Town of Woodbridge but, according to James Lapides, only one address is permitted for an account, even a joint one, for the purpose of registration and information is sent only to that address. It a second party on an account makes a specific request, then duplicate copies of confirmations and sales would be sent to him or her.
On the opening of a new account, the plaintiff's principal office in New York prepares a document known as Account Advisory in which all papers received are enumerated in sequential manner and missing documents are noted. The Account Advisory for account #42-556670-35 lists Jack Bender, David Bender and Norman Bender, 120 Stimson Road, New Haven, CT 06511-1613 as joint tenants, notes that a W-9 form was received at the New York office on September 8, 1994 but that the Client's Opening Agreement was missing. The W-9 form which is a payer's request for a taxpayer identification number was prepared by the plaintiff, signed by Jack Bender and contains the names of Jack Bender, David Bender and Norman Bender and the Stimson Road address. An instruction on the W-9 form is that if the account is joint, then all joint CT Page 1805 owners' names must be given.
The missing Client's Opening Agreement has for its beginning the words "Securities Agreement" and directly underneath "Joint Tenants With Right of Survivorship-Cash Account." As with the other documents, Jack Bender and the defendants are named as joint tenants. The number of the account, 042-556670-35, appears on all pages as does the tax identification number 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 which, as stated, was Jack Bender's social security number.
A Client's Opening Agreement is considered by the plaintiff to be essential to every account. An account may be opened and trading begun without this agreement but if the agreement is not signed and returned, the account will eventually be closed. The Client's Opening Agreement consists of two duplicates, one for the client, and the other for the plaintiff. Also included as a part of the package is a W-9 form. At least two Client's Opening Agreements were sent to Jack Bender, David Bender and Norman Bender at the Stimson Road address. The first set was sent, according to the business practices of the plaintiff by the new accounts clerk on August 10 or 11, 1994 with a covering letter bearing James Lapides' typed name but not his signature. The second set was accompanied by a letter dated August 10, 1994 and signed by Mark Borelli who was described therein as the plaintiff's branch manager. Mark Borelli did succeed James Lapides as branch manager of the New Haven office but not until sometime in September 1994. An original1 of the client's copy was introduced as defendants' exhibit 13 and an original of the complete package including the W-9 form was introduced as defendants' exhibit 14. Subsequently a copy of the client's duplicate and original of the plaintiff's duplicate were placed in evidence as plaintiff's exhibit A and as a part of plaintiff's exhibit L. In defendant's exhibits 13 and 14 and plaintiff's exhibit A and L, the places for the signatures of Jack Bender. David Bender and Norman Bender were blank.
The Client's Agreement form contains a section entitled Joint Account Agreement wherein parties agree in paragraph 1, that [they] are joint tenants with right of survivorship and not tenants in common and that when one dies, the entire account becomes the property of the survivor or survivors. In paragraph 3, the plaintiff is authorized to accept from any one of the joint-tenants any and all orders for this account as though all of the joint tenants had so ordered or instructed. The portion of the Client's Agreement that is most at issue, however, is CT Page 1806 paragraph 13 of the initial and untitled section that immediately precedes the Joint Account Agreement. Paragraph 13 is an arbitration clause that reads as follows:
Arbitration is final and binding on the parties.
 The parties are waiving their right to seek remedies in court including the right to jury trial.
 Pre-arbitration discovery is generally more limited than and different from court proceedings.
 The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. The panel of arbitrators shall typically include a minority of arbitrators who were or are affiliated with the securities industry.
The clause continues with the following language as contained in the originals of the Client's Opening Agreement submitted as defendants' exhibit 13 and plaintiff's exhibit L and the copy that is plaintiff's exhibit A:
 We agree that all controversies which might arise between us concerning any transaction (whether executed or to be executed within or outside of the United States), our account or this or any other agreement between us, whether entered into prior, on or subsequent to the date indicated on the signature page shall be determined by arbitration. The arbitration may be before either the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. or any other self-regulatory organization of which PSI is a member, as we may elect and shall be governed by the laws of the State of New York. If we do not make such election by registered mail addressed to you at your main office within five (5) days after demand by you that we make such election, then you may make the election. Any notice in connection with such arbitration proceeding may be sent to us by mail and we hereby waive personal service. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction without notice to us. No person shall bring a putative or certified class action to arbitration nor seek to enforce any predispute arbitration agreement against any person who initiated in court a putative class action; or CT Page 1807 who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated therein.
The above-mentioned arbitration clause, either as quoted or with slight modifications2 is a standard feature of the Client's Opening Agreement required by the plaintiff. Such a provision existed in the agreement for Jack Bender's individual account (#042-416910-35) and in the agreements underlying the defendants' other accounts with the plaintiff.
On August 24, 1994, the plaintiff acting upon an oral request of Jack Bender sold 100 shares of the Bristol Myers Squibb stock that was in account no. 042-556670-35. Neither David nor Norman Bender was notified of the sale. A portion of the proceeds of the sale was held by the plaintiff for income tax purposes because the W-9 form had not yet been returned and the remainder remained in the account as a money market asset.
Shortly after the sale of the 100 shares, James Lapides asked Jack Bender about returning the Client's Opening Agreement for account #042-556670-35 and was informed by Jack Bender that the agreement would not be signed or that it would not happen. Immediately thereafter, James Lapides contacted Attorney John Powers of the plaintiff's law department in New York. The result of Lapides' conversation with Attorney Powers was that on September 1, 1994, the portion of the proceeds of the sale withheld for income tax liability was returned, the money market asset was sold, the sale of the 100 shares was cancelled so that once again there were 1,000 shares of Bristol Meyers Squibb stock in account #042-556670-35 and then the 1,000 shares were transferred to account #042-416910-35, Jack Bender's individual account. The plaintiff's records recite that the 1,000 shares of stock were transferred pursuant to a Letter of Authorization but, this is incorrect. The plaintiff did not require a letter of authorization to place the stock in Jack Bender's individual account and the reference to a Letter of Authorization was to the original Letter of Authorization which enabled the 1,000 shares of stock to be transferred from the individual account to the joint account that Jack Bender had set-up for himself and his two CT Page 1808 sons. The plaintiff never consulted with David and Norman Bender regarding the transfer nor notified them in any way that the 1,000 shares of stock had been withdrawn from the joint account and returned to Jack Bender's individual account.
When the defendants learned of the transaction, they consulted Attorney Judelson who sent letters on their behalf to James Lapides on September 8 and 10, 1994. In the September 10th letter, Attorney Judelson referred to a conversation he had had with Attorney Powers of the plaintiff's law department. One aspect of the conversation was Judelson's suggestion that a freeze be placed on the 1,000 shares of stock. Another aspect dealt with Power's suggestion of an interpleader action by which the ownership of the stock would be determined. Also in the September 10th letter, Attorney Judelson stated that with regard to the underlying facts, he understood from David and Norman Bender that they had signed the necessary documentation to open the joint account at least once as had Jack Bender. The stock was frozen in Jack Bender's individual account (#42-496910-35) pursuant to an interoffice memo sent by Attorney Powers to the plaintiff's credit department.
The plaintiff's interpleader complaint was served upon Jack Bender, Alice Bender, David Bender and Norman Bender on November 23, 1994. On June 22, 1995, Jack Bender's counsel, Bernard Pellegrino sent a written demand for arbitration to the plaintiff. On November 16, 1995, Attorney Pellegrino moved to compel arbitration. The motion to compel arbitration was filed under the number and caption of the present case and not as a separate statutory proceeding under Gen. Stat. § 52-410. Previously on November 8, 1995, the plaintiff's motion to stay arbitration had been filed. A motion for a stay [of court proceedings] pending arbitration was filed on Jack Bender's behalf by Attorney Pellegrino on November 21, 1995.
Jack Bender's motions to compel arbitration and for a stay of proceedings pending arbitration together with the plaintiff's motion to stay arbitration came before Judge Booth on December 4, 1995. In the motions both Jack Bender and the plaintiff had disclaimed a need for oral testimony and the hearing before Judge Booth therefore was limited to oral arguments by the attorneys.
The interpleader complaint refers only to the joint account and does not mention the plaintiff's transfer of the stock to Jack Bender's individual account. From Attorney Pellegrino's CT Page 1809 presentation before Judge Booth, however, especially his dichotomy of account one and account two, it is evident that two accounts were involved and that the freeze was placed on the stock after it was returned to Jack Bender's individual account. It is also evident that: Jack Bender's claim to arbitration is predicated on his having signed the Client's Opening Agreement in his individual account.3 The stance of Attorney Doernberger, present counsel for David and Norman Bender, was that his clients never signed the agreement containing the arbitration agreement in the joint account and therefore could not be compelled to arbitrate. Attorney Grove from the office of the plaintiff's attorney brought up the possibility of inconsistent judgments if one defendant's claim to ownership of the stock were sent to arbitration and the remaining detendants' claims remained for trial in the court.
After listening to the attorneys, Judge Booth granted Jack Bender's motion to compel arbitration and granted as to Jack Bender only, his motion to stay proceedings pending arbitration. The plaintiff's motion to stay arbitration was denied. A suggestion from Judge Booth was that the plaintiff attempt to avoid the spectre of inconsistent judgments by researching the question of whether nonsignatories to an agreement with an arbitration clause could be required to abide by that provision.
On October 1, 1996, the plaintiff's "Motion to Stay Proceedings and to Compel Arbitration" was filed as to David and Norman Bender. Also filed were extensive memoranda both in favor of and against the motion. Judge Licari denied the motion without opinion or comment on October 21, 1996. No further articulation by Judge Licari was requested.
The plaintiff's final attempt to obtain a disposition before trial came in its Motion for Summary Judgment filed on May 23, 1997. As with the preceding motion to compel David and Norman Bender to arbitrate, this motion was also extensively briefed. The plaintiff claimed that the arbitrators' decision in favor of Jack Bender eliminated all issues of fact relating to owner ship of the stock and the defendants claimed that they were not bound by the arbitration award to which they were not parties and that the arbitration concerned only Jack Bender's individual account in which they had no interest. Judge Zoarski denied the motion for summary judgment in a 16 page memorandum iiled on March 24, 1998 as well as the plaintiff's subsequent motion for reconsideration. CT Page 1810
During the pendency of the court case, a hearing on Jack Bender's arbitration malter with the plaintiff took place in New York City on February 5 and 20, 1997. As mentioned previously, the arbitrators' award was in Jack Bender's favor.4 The complete transcript of that hearing is in evidence without reservation as plaintiff's exhibit K. Some of the testimonies of Jack Bender and James Lapides, the only two witnesses that were called, is relevant to what was Jack Bender's intent when he authorized the transfer of the stock into the joint account, an important issue in the case. The following are questions by Mr. Pellegrino and answers from Jack Bender.
 Q: Was it Mr. Lapides you talked to about creating a joint account?
A: Yes.
 Q: Did you tell him whom you wanted to create this joint account with?
 A: Yes, I called him, I did all my — most of my business on the telephone. And I told him whose names to put it in.
Q: Whose names did you tell him?
A: Mine, my son Norman, my son David.
Q: The three of you?
A: Right.
Q: And did he say he would begin to do this for you?
A: Yes, he did he started the account.
Q: Did he say he'd have to send you some paperwork?
 A: Oh, yes. I know it's customary whenever you open an account you have to sign this, the statement that Prudential sends you telling you what their rights are.
 Q: Do you recall at the time if you told him why you wanted to open this joint account? CT Page 1811
 A: Well, I told him that I decided to try to keep some peace in the family and I just decided to give this amount to them in the hope that would make more peace in the family. They have four children, two girls and two boys, and I thought that might smooth relationships.
When James Lapides was examined by Mr. O'Hanlon he responded to certain questions as set forth below.
 Q: And did Prudential ever receive back a signed account opening statement?
A: No. we did not.
Q: What happened after that if you recall?
 A: My best recollection is that the documents did not come forth and I called Jack and asked him why they hadn't. And I believe he referenced the fact that he was not comfortable with the fact that both his sons would have to sign this document. He sort of wanted to just keep this as a joint account and when he died they would receive it.
Q: You mean he wanted to have a survivorship account?
A: Yes.
In the early 1980s, David and Norman Bender succeeded Jack in operating the business known as Bender Plumbing Supply. After 1984, Jack Bender was no longer on the business payroll. Prior to 1994, David, Norman and their sister Lois paid Jack Bender $185,000 at his request for the residence at 120 Stimson Road.
With respect to securities transactions, Jack Bender's attitude toward his sons appears to have been tyrannical. Before the advent of the present dispute, Jack Bender had opened accounts for David and Norman for which accounts he, alone, bought and sold securities. Jack Bender presented documents to his sons to sign which they did without reading the documents. Some of these documents were Client's Opening Agreements for their individual accounts. David and Norman Bender testified that reading or questioning a document pertaining to stocks would have been found to be insulting or offensive by their father. As of April 30, 1994, David Bender's individual account with the plaintiff totaled $2,673,880.22. The monthly Client's Statement CT Page 1812 showed that it was sent to Jack Bender at 120 Stimson Road with the later addition of a copy to David Bender at his Woodbridge address. Norman Bender's individual account was smaller but was worth more than $1,000,000.00
An irreconcilable dispute exists between the testimony of David and Norman Bender, on one hand, and James Lapides, on the other, as to the signing and delivery of the Client's Opening Statement for the joint account. David Bender's testimony was that he was informed by his father in the summer of 1994 of the joint account containing Bristol Myers Squibb stock. At Jack Bender's residence, he was given one or more documents to sign which he did without reading what he had signed. Then he either left the papers or took them with him for Norman to sign. Norman Bender's testimony was that his father had told him of his intention to purchase 1,000 shares of Bristol Myers Squibb and put the stock in a joint account with right of survivorship for himself, Norman and David. In the early fall of 1994 at Jack Bender's residence he was told to sign a document akin in looks to defendants' exhibit 13 and was also told that "we're opening the account." After the document was signed. Norman Bender said that his father placed it in a sealed envelope, gave the envelope to him, and he brought the envelope to James Lapides at the plaintiff's New Haven office. James Lapides' consistent testimony was that the Client's Opening Agreement was never received.
The testimonial dispute extends to whether conversations occurred between either defendant and James Lapides, and if so their substance, after the stock was transferred to the joint account or after the 100 shares were sold or after the stock was returned to Jack Bender's individual account. On Norman Bender's direct examination the following questions were asked by Attorney Doernberger and answered by the witness.
 Q: Did there come a point in time when you had any conversations with Mr. Lapides about the joint account?
A: Very definitely.
Q: When was that?
 A: When my brother showed me the paper that a 100 shares had been taken out, I called Jim Lapides on the phone and we had a definite conversation in which I said we don't want shares going out without everyone's approval. I want those shares to CT Page 1813 stay there, so does my brother, until we get this resolved. He said, believe me, I won't mess with them and the next thing I heard is that they were in my father's personal account.
James Lapides was a witness twice, once for the defendants and later for the plaintiff. As a defense witness, he testified in response to questions by Mr. Doernberger that with respect to the sale of the 100 shares, he had no conversations or correspondence with either David or Norman Bender. The same answer was given to questions about conversations or correspondence when the stock was transferred from the joint account to Jack Bender's individual account. When James Lapides appeared as a witness for the plaintiff, his testimony was essentially the same; that he had no communications with the defendants and received no correspondence from or pertaining to them until the arrival of Attorney Judelson's letter dated September 8, 1994 requesting copies of documentation regarding the formation of the joint account and transactions processed through that account.
Some further factual findings have been made and appear in subsequent sections of this memorandum.
 II
At the outset, consideration must be given to the plaintiff's contention that the arbitration clause in the Client's Opening Agreement has the effect of withdrawing subject matter jurisdiction from the court. Cognizance of the claim that subject matter jurisdiction is absent must be taken and the matter ruled upon before the court can move further as any subsequent action is necessarily an exercise of jurisdiction. Statewide GrievanceCommittee v. Rozbicki, 211 Conn. 232, 245 (1989). From an analytical perspective, the proper starting point is Judge Licari's one-word denial of the plaintiff's Motion to Stay Proceedings and to Compel Arbitration filed on October 1, 1996 in an action that commenced on November 23, 1994. Although the motion states that it was brought pursuant to Gen. Stat § 52-409, a more expeditious route would have been a proceeding under § 52-410 with its right of appeal, SuccessCenters. Inc. v. Huntington Learning Centers, Inc.,223 Conn. 761, 769 (1992), including a provision for articulation. Practice Book § 66-5.
CT Page 1814 The similarities and differences between § 52-409 and § 52-410 proceedings are discussed in Success Centers, Inc. v.Huntington Leurning Centers, Inc., supra.
 We are persuaded that §§ 52-409 and 52-410 serve distinct functions. Section 52-409 provides relief when a party to a contract that contains an arbitration clause desires arbitration of a dispute, and the other party instead of proceeding with arbitration institutes a civil action to resolve the dispute. The party desiring arbitration can then seek a stay of the civil action. In contrast, § 52-410
comes into play when no action is pending between the parties, the parties have a contract providing for arbitration and the parties are unable to agree about the arbitrability of the dispute. In that case, one of the parties may apply to the trial court in accordance with the distinct statutory procedure for an order directing the parties to proceed with arbitration.
 In either case, in granting or denying a stay under § 52-409, or in granting or denying an order directing the parties to proceed with arbitration under § 52-410, the trial court must determine whether the contract between the parties provides for arbitration.
Id. at 768-69.
Certain aspects of procedures seeking arbitration are made clear by Success Centers, Inc. v. Huntington Learning Center,Inc. while others are not. An order granting or denying a § 52-409 motion is an interlocutory and nonappealable ruling. Bllt an order directing or refusing to direct arbitration under § 52-410, being based on a separate statutory action, is a final judgment in that action and, therefore, appealable. Id. at 769. What is not clear from the decision is the seeming pronouncement that § 52-410 is usable only when no action has been brought. To the contrary, a § 52-410 action has been entertained and arbitration ordered during the pendency of a related suit. See Schwarzchild v. Martin, 191 Conn. 316, 318-19
(1983).
In the brief attached to the motion before Judge Licari, the plaintiff claimed that the defendants were bound by the arbitration clause because of Attorney Judelson's statement in his letter to James Lapides to which reference is made on p. 11, CT Page 1815supra. The brief for the defendants states that no agreement providing for arbitration had been produced. Judge Licari's denial of the plaintiff's motion could have been predicated upon the absence of a written contract. Bennett v. Meader,208 Conn. 352, 360, 362 (1988). The denial could also have been based on the theory of waiver. An arbitration clause may be waived by the party entitled to its benefit. Giulietti v. Connecticut Ins.Placement Facility, 205 Conn. 424, 432 (1987). An unjustifiable delay in seeking arbitration may warrant a finding of waiver.Batter Building Materials Co. v. Kirschner, 142 Conn. 1, 11
(1954).
This court, however, will consider anew the question of whether this dispute should have been submitted to arbitration. Not only can subject matter jurisdiction be raised at any time,Statewide Grievance Committee v. Rozbicki, supra, 211 Conn. 245, it is also well settled that a decision by one judge is not binding on another judge when later in the same proceeding he is confronted with the same or a similar question. Schwartzchild v. Martin, supra, 191 Conn. 325. These maxims are especially applicable in this case where the question of whether the court or a panel of arbitrators was the proper tribunal became, for the first time, the subject of evidence.
Where, as here, the case is tried to the court, the judge determines the credibility of witnesses and the weight to be given to their respective testimonies. Weiler v. Commissioner ofCorrection, 47 Conn. App. 59, 61 (1997). At trial, the defendants' statements under oath regarding the execution and delivery of the Client's Opening Agreement for the joint account was certainly more in accord with Attorney Judelson's letter than with the representations made in their behalf by Attorney Doernberger before Judges Booth and Licari. James Lapides' testimony, both before the court and before the arbitration panel, that an executed Client's Opening Agreement form had not been delivered and that he had been told by Jack Bender that such would not be delivered was, however, consistent and supported by the absence of signatures on defendants' exhibits 13 and 14 and plaintiff's exhibits A and L. Accordingly, the court holds that a Client's Opening Statement pertaining to the joint account was neither executed nor delivered.
In Connecticut a provision for arbitration can be enforced only if it is incorporated into a written contract or in a separate writing executed by the parties to a written contract. CT Page 1816 Gen. Stat. § 52-408. Although this language has been construed to mean that under some circumstances a party can be bound by an arbitration clause even though he did not sign the written contract in which the clause appeared if his assent to the contract is otherwise indicated such as by the acceptance of contractual benefits. Schwartzchild v. Martin, supra,191 Conn. 322. But there must be a written agreement. Bennett v. Meader,208 Conn. 352, 360-61 and n. 7 (1988). An agreement to arbitrate must meet the requirements of § 52-408 including the requirement that the agreement be in writing and if not the agreement will be invalid. White v. Kampner, 229 Conn. 465, 477
n. 12 (1994) (explaining Bennett v. Meader).
The court rejects the plaintiff's claim that previous Client's Opening Agreements that were signed by the defendants to open other accounts can serve as a "separate writing" under § 52-408. A Client's Opening Agreement is a distinct standardized contract used by the plaintiff to open every new account no matter how many other accounts the same client may have. The Client's Opening Agreement for the joint account that was unsigned and undelivered does not mention similar agreements that were signed by David and Norman Bender5 at an earlier time when they opened their individual accounts. To qualify a document as a "separate writing," the written contract must contain a reference to it in such a manner as to establish that the parties intended to make the terms and conditions of the other document a part of their understanding so that the two may be interpreted together as the agreement of the parties. BatterBuilding Materials Co. v. Kirschner, supra, 142 Conn. 7; Lamb v.Emhart Corp., 47 F.3d 551, 558 (2d Cir. 1995) (applying Connecticut law); Orange Improvements Partnership v. Cardo, Inc.,984 F. Sup. 85, 92 (D. Conn. 1997) (applying Connecticut law).
The remedy of arbitration comes from a written contract made by the parties. White v. Kampner, supra, 229 Conn. 471. Since the court has found that the Client's Opening Agreement was neither executed nor delivered, there was no written contract between the parties. Consequently, the defendants were under no obligation to submit their claim to arbitration.
 III A.
Next the court must decide whether Jack Bender's action in CT Page 1817 opening the joint account amounted to a valid intervivos gift to the defendants as they claim or whether such action was only an attempted and ineffective causa mortis6 disposition or no gift at all as the plaintiff contends. The decision on this issue has important consequences. A determination that a gift was made is not reviewable unless the court's conclusion is one that it could not reasonably reach. Dalia v. Lawrence, 226 Conn. 51, 71
(1993), Kriedel v. Krampitz, 137 Conn. 532, 534 (1951).
To constitute a valid intervivos gift of personal property the donor must intend that title should pass immediately and there must be a delivery of possession. Kukanskis v. Jasut,169 Conn. 29, 34 (1975). An intended intervivos gift is not defeated because the donor also intended to postpone the enjoyment of it to a future date. Halisey v. Howard, 148 Conn. 466, 469 (1961). One factor that distinguishes a gift intervivos from a gift causa mortis is that the donee must receive his title during the donor's lifetime. Fasano v. Meliso, 146 Conn. 496, 499 (1959).
Intent is described as a state of mind in which a person seeks to accomplish a given result through a course of action. Black's Law Dictionary 810 (6th ed. 1990). As a mental process, a person's intent must, of necessity, be proven by his statements and actions. State v. Patterson, 213 Conn. 708, 721 (1990).
On August 10, 1994, Jack Bender executed the Letter of Authorization7 supplied by the plaintiff in which he told the plaintiff to transfer 1,000 shares of Bristol Myers Squibb stock from his individual account to a new account consisting of himself, Norman Bender and David Bender. In the Letter of Authorization, Jack Bender, who had been the sole owner, relinquished for himself all right, title and interest in the 1,000 shares. Jack Bender signed his name on the W-9 form that listed his name along with the defendants as joint owners. Later, at his arbitration hearing, Jack Bender testified as reported on pp. 14 and 15, ante. Included in his words were that he called James Lapides and told him to create a joint account in the names of himself and his two sons. The testimony of James Lapides at the same hearing, reported at pp. 15-16 ante, was hardly contrary. In describing his conversation with Jack Bender, Lapides also referred to "joint account" and "survivorship." Parenthetically a reservation of income to Jack Bender for life is not necessarily inconsistent with the creation of a joint tenancy or a completed gift. Candee v. Connecticut Savings Bank,81 Conn. 372, 374 (1908); see Kukanskis v. Jasut, supra, CT Page 1818169 Conn. 34. The court concludes as an issue of fact, Bachmann v.Reardon, 138 Conn. 665, 667 (1952), that the defendants have proven that when Jack Bender signed the Letter of Authorization, his intent8 was to create a joint account for himself and them.
 B.
The type of delivery required to complete an intervivos gift depends apparently on the subject matter involved. "For a constructive delivery, the donor must do that which, under the circumstances, will in reason be equivalent to an actual delivery. It must be as nearly perfect and complete as the nature of the property and the circumstances will permit." HebrewUniversity Assn. v. Nye, 148 Conn. 223, 232-33 (1961).
Specifically with respect to securities, an actual delivery of a certificate of stock made out to a specified person will, of course, pass title in the stock to the recipient.Hartford-Connecticut Trust Co. v. Slater, 114 Conn. 603, 613
(1932). But several methods of constructive delivery have also been ruled permissible. A delivery of stock certificates occurs when the donor transfers them to the donee on the books of the corporation. McDonough v. McDonough, 762 S.W.2d 827, 829
(Mo.App. 1988); Matter of Carroll, 474 N.Y. So.2d 340, 342 (1984). And very close to this case, a letter from the donor to the brokerage firm directing a transfer of individually owned securities to a joint account was upheld as a constructive delivery. Tanner v.Robinson, 411 So.2d 240, 241 (Fla.App. 1982).
The Bristol Myers Squibb stock in the joint account was held in "street name."9 This means that the shares were held in the name of the plaintiff with Jack, David and Norman Bender being equitable owners. To effectuate a transfer when a security is held in "street name" it is unnecessary to surrender a stock certificate to the corporation and have it reissued in the name of the new owner. Instead the transfer is recorded on the books of the brokerage house in whose name the security is held. The plaintiff's Securities Account Statement for the month of August 199410 showed that 1,000 shares of Bristol Myers Squibb stock were received in the joint account #042-55670-35 on August 12, 1994. A completed delivery has been proved.
In some jurisdictions acceptance by the donee is described as a third requisite of a valid intervivos gift, e.g. Matter ofCT Page 1819Carroll, supra, 474 N.Y.S.2d 342 (1984). Connecticut jurisprudence is that when a gift is beneficial, as this one obviously was, the donee's acceptance is presumed. Hartford-Connecticut Trust Co. v. Slater, supra, 114 Conn. 613. Aside from the presumption, the court finds as a fact from the testimony of the defendants that they readily accepted their father's gift of an undivided two-thirds interest in the Bristol Myers Squibb stock.
 C.
All elements required for a common law intervivos gift have been proved. In the absence of a resulting or constructive trust, the gift was irrevocable. Manyak v. Manyak, 29 Conn. Sup. 1, 2
(1970); Dean v. Dean, 379 S.E.2d 742, 744 (Va.App. 1989).
In the court's opinion, the plaintiff's arguments that Jack Bender could subsequently repudiate his gift and that the plaintiff was justified in helping him are legally unsound.
 IV
Having held that the transfer of the Bristol Myers Squibb stock to the joint account was a valid common law gift, the court must review the applicability of title 8 of the Uniform Commercial Code. The parties are in doubt as to the effect of title 8 on the common law rules pertaining to gifts. The plaintiff claims that title 8 is inapplicable but if it does apply, there has been no compliance with its provisions. The stance of the defendants is that if title 8 is applicable, there has been compliance with its terms. Title 8 was substantially revised in 1997. Public Act 97-182 (Jan. Sess. 1997). The pertinent language of the sections at issue, however, namely §§ 42a-8-102(1), 42a-8-201(1) and 42-8-313(1), is the same as in 1994.
To start off, the general definition section of the code includes "gift or any other voluntary action creating an interest in property" in its definition of "Purchase." A "Purchaser" is defined as a person who takes by purchase. The relevant part of § 42-8-301(1) states that "Upon a transfer of a security to a purchaser, as provided in section 42a-8-313, the purchaser acquires the rights in the security which his transferor had or had actual authority to convey . . ." CT Page 1820
Title 8 divides securities into two types, certified securities and uncertified securities: the principal difference being the presence or absence of a stock certificate. Gen. Stat. § 42a-8-102(1). Shares that are held by a broker in "street name" are uncertified securities. Bains v. Piper, Jaffray Hopwood, Inc., 497 N.W.2d 263, 268 (Minn.App. 1993).
Section 42a-8-313(1) provides various methods of transfer for both certified and uncertified securities. The method that is applicable here is the one in § 42a-8-313(1)(d) which reads as follows:
 (1) a transfer of a security . . . to a purchaser occurs only: (d) at the time a financial intermediary, not a clearing corporation, sends him confirmation of the purchase and also by book entry or otherwise identifies as belonging to the purchaser (ii) a quantity of securities that constitute or are part of a fungible bulk of uncertified securities registered in the name of the financial intermediary.
(Emphasis supplied.)
What divides the parties is the word "confirmation" in § 42a-8-313(1)(d). From experience the court is aware that every time a person buys or sells stock, he receives a "confirmation" slip from the broker. James Lapides testified that for transfers from one account to another, as distinguished from a sale or purchase, the plaintiff did not send out confirmations. From his testimony the plaintiff concludes that since the transfer from Jack Bender's individual account to the joint account of Jack Bender, David Bender and Norman Bender was never confirmed: hence, it never took place. The plaintiff, therefore, was justified in returning the Bristol Myers Squibb stock to Jack Bender's individual account. The court disagrees.
There is no question that the plaintiff is a "financial intermediary" as that term is defined in § 42a-8-313(4). The purpose of the confirmation requirement is to ensure that evidence exists to prove that the financial intermediary is holding the securities in a customer account rather than for its own account. The principal reason for its insertion into the code is to protect the client in the event that the financial intermediary becomes insolvent. 20 West, Conn. Gen. Stats. Anon., comments 241. In the plaintiff's Securities Account Statement for CT Page 1821 August 1994 prepared on the plaintiff's letterhead and sent to the three owners of the joint account at 120 Stimson Road which was admitted as defendants' exhibit 5, the entry of the receipt of 1,000 shares of Bristol Myers Squibb stock on August 12, 1994 clearly appears. This entry was, in the court's view, sufficient confirmation.
In sum, the court holds that "confirmation" as used in § 42a-8-313(1)(d) has a broader meaning than the confirmation slips sent by brokers for sales and purchases. The proper meaning of "confirmation," in this instance, is as a synonym for acknowledgment or affirmance. The court believes that its interpretation comports with the opinion of the Minnesota Appellate Court in Bains v. Piper, Jaffray Hopwood, Inc.,supra, 497 N.W.2d 271. And that it is also in the spirit of the decision by our Supreme Court in Merrill, Lynch, Pierce, Fenner Smith, Inc. v. Cole, 189 Conn. 518 (1983), where the question of a writing to satisfy § 42a-8-31911 was at issue and where at p. 532 the court stated that a "confirmation notice" was "signed" within the definition of § 42a-1-201(39). That section provides that "Signed" includes "any symbol executed or adopted by a party with present intention to authenticate a writing."
In the present case no tension exists between the common law essentials for a gift and the transfer requisites of § 42a-8-313 because the court has found compliance with both. Situations can arise, however, where the transfer requirements were not completed and the donor dies. Compare Matter of Estateof Crawford, 795 S.W.2d 835, 839 (Tex.App. 1990) (claimed gift defeated) with Panzirer v. Deco Purchasing Distributing Co.,Inc., 448 So.2d 1197, 1200 (Fla.App. 1984) (gift upheld). This court agrees with a statement from the Florida Court of Appeal that appears in Tanner v. Robinson, supra, 411 So.2d 242: "it seems universally to be held that these provisions of the U.C.C. are not exclusive and do not undercut the validity of a gift of securities which is otherwise effective under common law standards." Also in agreement are the two Connecticut decisions found on related U.C.C. sections:12 Jaworski v. Dwyer, No. CV93 0521516 S (J.D. Hartford-New Britain 1995); Solomon v.Allen, 93, 67811 S (J.D. Middlesex 1994). Especially applicable is the following comment from Solomon v. Allen: "It would be bizarre to conclude that a gift between two parties could be defeated by the actions of a third party who has no interest in the donative process except to follow the instructions of the CT Page 1822 donor . . ."
 V
Of the plaintiff's nine non jurisdictional special defenses only three have been briefed: waiver, estoppel and laches. As stated, these defenses concern what the plaintiff claims the defendants should have done or failed to do with regard to Jack Bender's arbitration hearing and its result. The plaintiff appears to have forgotten that it was the doing of James Lapides, its local manager, in transferring the Bristol Myers Squibb stock from the joint account to Jack Bender's individual account that enabled Jack sender to compel arbitration. The plaintiff's evidence was that Lapides was advised to make the transfer by the plaintiff's legal department.
The court agrees that "waiver" is the intentional relinquishment of a known right and that it may be inferred from conduct. Hensley v. Comissioner of Transportation, 211 Conn. 173,179 (1989). The court disagrees however with the plaintiff's contention that a waiver of the right to a trial occurred when David and Norman sender testified that they signed the Client's Opening Agreement for the joint account and such testimony contradicted Attorney Doernbergers representation that the document had not been signed. Prior to bringing the interpleader action, the plaintiff was aware from Attorney Judelson's second letter that the defendants claimed to have signed the agreement. Attorney Doernberger's representation was also before trial. At most, the plaintiff's claim concerns a party's admission. See,Pedersen v. Vahidy, 209 Conn. 510, 519-20 (1989). It was something that should have been ascertained either through depositions, Practice Book § 13-31(a) (formerly § 248), or a request for admissions. Id. §§ 13-22, 13-24 (formerly § 236B, 238-240). See Drew v. K-Mart Corp., 37 Conn. App. 239,250-51 (1995).
The court also agrees with the plaintiff's description of "estoppel" as having two parts: inducement and reliance. Boyce v.Allstate Ins. Co., 236 Conn. 375, 385 (1996). But, as pointed out in the preceding paragraph, the plaintiff's claim falls properly into the area of inconsistent admissions by the defendants or their counsel. Further, the plaintiff has neglected to mention a caveat to the rule of estoppel. "It is fundamental that a person who claims an estoppel must show that he exercised due diligence to know the truth, and that he not only did not know of the true CT Page 1823 state of things but also lacked any reasonable means of acquiring knowledge." Chotkowski v. State, 240 Conn. 246, 268 (1997). The caveat presents a burden that the plaintiff cannot overcome.
The plaintiff's final special defense "laches" is correctly stated but, again, is misapplied. In claiming laches, the plaintiff occupies the role of a defendant on the counterclaim. Laches consists of an inexcusable delay in bringing suit that prejudices the defendant. Delay, alone, is not sufficient to bar a plaintiff's right to sue; the delay in bringing suit must be unduly prejudicial. A conclusion that a plaintiff has or has not been guilty of laches is one of fact for the trier. An appellate court cannot decide the question unless the subordinate facts found make such a conclusion inevitable as a matter of law.Cummings v. Tripp, 204 Conn. 67, 88 (1987).
The plaintiff's interpleader complaint was returned to court on December 27, 1994. The defendants' original answer and counterclaim was filed on June 21, 1996. The claim of prejudice, however, is based on later actions by the defendants: their declination to participate in the arbitration; their inaction in failing to arrest or to stop the enforcement of the result of the arbitration; and their declination to sue Jack Bender or file a claim against his estate.
There are of course, several short answers to these claims of wrongdoing. The court repeats ad nauseam that it was the plaintiff who put Jack Bender in a position to compel arbitration. Also the court's finding, that since the Client's Opening Agreement for the joint account was never executed, the defendants were not bound by its arbitration clause was induced in part by the plaintiff's evidence. The plaintiff paid Jack Bender as ordered by the arbitrators without any attempt to vacate or modify the award. See Gen. Stat. §§ 52-418, 52-419,52-420. It was the plaintiff, not Jack Bender or his estate, who filed a motion to confirm the award against the defendants who were not parties to the arbitration. Finally, the court is unaware of any rule of law that dictates who a party may sue. The plaintiff's defenses of waiver, estoppel and laches are rejected because they were rlot proved.
 VI
The defendants are entitled to relief and have requested it in two alternative forms. First, pursuant to § 42a-8-315(1)(c) CT Page 1824 a mandatory injunction that will compel the plaintiff to deposit Bristol Myers Squibb stock in the joint account. Second. pursuant to § 42a-8-315(1)(d), monetary damages equal in value to two thirds of the value of 1,000 shares of Bristol Myers Squibb stock, as of the date of transfer.
The court cannot grant the first of the requested remedies. Too much has happened to Bristol Myers Squibb stock in terms of splits and increased prices so that replacement would cause an unnecessary hardship to the plaintiff. The second remedy, however, will be granted. On September 1, 1994, the date of the wrongful transfer, the market value of the stock was $56 7/8 per share or $56,875.00 for the 1,000 shares. The defendants, David and Norman Bender are entitled to two thirds of this amount or $37,916.67.
The defendants have also requested prejudgment interest, an item that is within the court's discretion. Neiditz v. HousingAuthority, 231 Conn. 598, 602 (1995). In the court's opinion, the circumstances of the case do not warrant an addition of prejudgment interest to the award of damages.
Judgment is rendered in favor of the defendants on their counterclaim. The plaintiff is ordered to pay $37,916.67 and taxable costs to the defendants.
I wish to thank Joshua Yahwak, a student at Washington Lee Law School, who was my clerk in the summer of 1998, for his help with much of the research for this memorandum.
BARNETT, J.